**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. _____

13-20713 CR-UNGARO

18 U.S.C. § 1349
18 U.S.C. § 371
42 U.S.C. § 1320a-7b(b)(1)(A)
18 U.S.C. § 2
18 U.S.C. § 982

/TORRES

Sealed

**UNITED STATES OF AMERICA**

**vs.**

FILED by _____ D.C.

SEP 2 4 2013

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

**ISABEL MEDINA,**
**LERIDA LABRADA,**
**MAYRA FLORES,**
**and**
**GERMAN MARTINEZ,**

                    **Defendants.**
_____/

**INDICTMENT**

The Grand Jury charges that:

**GENERAL ALLEGATIONS**

At all times material to this Indictment:

**The Medicare Program**

1.      The Medicare Program ("Medicare") was a federal health care program providing benefits to persons who were over the age of 65 or disabled.  Medicare was administered by the United States Department of Health and Human Services ("HHS") through its agency, the Centers for Medicare & Medicaid Services ("CMS").  Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

2.      Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

3.      "Part A" of the Medicare program covered certain eligible home health care costs for medical services provided by a home health agency ("HHA"), to beneficiaries who required home health services because of an illness or disability that caused them to be homebound. Payments for home health care medical services under Medicare Part A were typically made directly to an HHA or provider based on claims submitted to the Medicare program for qualifying services that had been provided to eligible beneficiaries, rather than to the beneficiary.

4.      Physicians, clinics and other health care providers, including HHAs, that provided services to Medicare beneficiaries were able to apply for and obtain a "provider number."  A health care provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries. A Medicare claim was required to set forth, among other things, the beneficiary's name and Medicare information number, the services that were performed for the beneficiary, the date that the services were provided, the cost of the services, and the name and identification number of the physician or other health care provider who ordered the services.

5.      CMS did not directly pay Medicare Part A claims submitted by Medicare-certified HHAs.  CMS contracted with different companies to administer the Medicare Part A program throughout different parts of the United States.  In the State of Florida, CMS contracted with Palmetto Government Benefits Administrators ("Palmetto") to administer Part A HHA claims.  As administrator, Palmetto was to receive, adjudicate and pay claims submitted by HHA providers under the Part A program for home health claims.

### Part A Coverage and Regulations

### Reimbursements

6.     The Medicare Part A program reimbursed 100% of the allowable charges for participating HHAs providing home health care services only if the patient qualified for home health benefits.  A patient qualified for home health benefits only if:

     a.     the patient was confined to the home, also referred to as homebound;

     b.     the patient was under the care of a physician who specifically determined there was a need for home health care and established the Plan of Care ("POC"); and

     c.     the determining physician signed a certification statement specifying that the beneficiary needed intermittent skilled nursing services, physical therapy, or speech therapy and that the beneficiary was confined to the home; that a POC for furnishing services was established and periodically reviewed; and that the services were furnished while the beneficiary was under the care of the physician who established the POC.

7.     HHAs were reimbursed under the Home Health Prospective Payment System ("PPS").  Under PPS, Medicare paid Medicare-certified HHAs a predetermined base payment for each 60 days that care was needed. This 60-day period was called an "episode of care."  The base payment was adjusted based on the health condition and care needs of the beneficiary.  This adjustment was done through the Outcome and Assessment Information Set ("OASIS"), which was a patient assessment tool for measuring and detailing the patient's condition.   If a beneficiary was still eligible for care after the end of the first episode of care, a second episode could commence.  There were no limits to the number of episodes of home health benefits a beneficiary could receive as long as the beneficiary continued to qualify for home health benefits.

8.      In order to be reimbursed, the HHA would submit a Request for Anticipated Payment ("RAP") and subsequently receive a portion of its payment in advance of services being rendered. At the end of a 60-day episode, when the final claim was submitted, the remaining portion of the payment would be made. As explained in more detail below, "Outlier Payments" were additional PPS payments based on visits in excess of the norm. Palmetto paid Outlier Payments to HHA providers under PPS where the providers' RAP submissions established that the cost of care exceeded the established Health Insurance Prospective Payment System ("HIPPS") code threshold dollar amount.

<u>**Record Keeping Requirements**</u>

9.      Medicare Part A regulations required HHAs providing services to Medicare patients to maintain complete and accurate medical records reflecting the medical assessment and diagnoses of their patients, as well as records documenting actual treatment of the patients to whom services were provided and for whom claims for reimbursement were submitted by the HHAs. These medical records were required to be sufficient to permit Medicare, through Palmetto and other contractors, to review the appropriateness of Medicare payments made to the HHA under the Part A program.

10.     Among the written records required to document the appropriateness of home health care claims submitted under Part A of Medicare was a POC that included the physician order for home health care, diagnoses, types of services/frequency of visits, prognosis/ rehabilitation potential, functional limitations/activities permitted, medications/treatments/ nutritional requirements, safety measures/discharge plans, goals, and the physician's signature. Also required was a signed certification statement by an attending physician certifying that the

patient was confined to his or her home and was in need of the planned home health services, and an OASIS.

11.     Medicare Part A regulations required provider HHAs to maintain medical records of every visit made by a nurse, therapist, and home health aide to a beneficiary. The record of a nurse's visit was required to describe, among other things, any significant observed signs or symptoms, any treatment and drugs administered, any reactions by the patient, any teaching and the understanding of the patient, and any changes in the patient's physical or emotional condition. The home health nurse, therapist and aide were required to document the hands-on personal care provided to the beneficiary as the services were deemed necessary to maintain the beneficiary's health or to facilitate treatment of the beneficiary's primary illness or injury. These written medical records were generally created and maintained in the form of "clinical notes" and "home health aide notes/observations."

### Special Outlier Provision

12.     Medicare regulations allowed certified home health agencies to subcontract home health care services to nursing companies, registries, or groups (nursing groups), which would, in turn, bill the certified home health agency. That certified home health agency would then bill Medicare for all services provided to the patient by the subcontractor. The HHA's professional supervision over arranged-for services required the same quality controls and supervision of its own employees.

13.     For insulin-dependent diabetic beneficiaries, Medicare paid for insulin injections by an HHA when a beneficiary was determined to be unable to inject his or her own insulin and the beneficiary had no available care-giver able and willing to inject the beneficiary. Additionally, for beneficiaries for whom occupational or physical therapy was medically

necessary, Medicare paid for such therapy provided by an HHA. The basic requirements that a physician certify that a beneficiary is confined to the home or homebound and in need of home health services, as certified by a physician, was a continuing requirement for Medicare to pay for such home health benefits.

14.     While payment for each episode of care was adjusted to reflect the beneficiary's health condition and needs, Medicare regulations contained an "outlier" provision to ensure appropriate payment for those beneficiaries who had the most extensive care needs, which may result in an Outlier Payment to the HHA. These Outlier Payments were additions or adjustments to the payment amount based on an increased type or amount of medically necessary care. Adjusting payments through Outlier Payments to reflect the HHA's cost in caring for each beneficiary, including the sickest beneficiaries, ensured that all beneficiaries had access to home health services for which they were eligible.

### The Defendants and Related Companies

15.     Flores Home Health Care, Inc. ("Flores Home Health") was a Florida corporation incorporated on or about July 31, 2007, that did business in Miami-Dade County, Florida, as an HHA that purported to provide home health care services to eligible Medicare beneficiaries. On or about October 10, 2009, Flores Home Health obtained Medicare provider number 10-9395, authorizing Flores Home Health to submit claims to Medicare for HHA-related benefits and services. Marina Sanchez Pajon and Miguel Jimenez owned and operated Flores Home Health.

16.     Billing Advance, LLC ("Billing Advance"), was a Florida corporation incorporated on or about January 11, 2010, that did business in Miami-Dade County, Florida. Marina Sanchez Pajon and Miguel Jimenez owned and operated Billing Advance.

17.     Defendants **ISABEL MEDINA, LERIDA LABRADA, MAYRA FLORES**, and **GERMAN MARTINEZ** were residents of Miami-Dade County, Florida.

18.     **ISABEL MEDINA** was the owner and operator of Yanis Telemarketing Services, Corp. ("Yanis Telemarketing"), a corporation organized under the laws of the State of Florida, which purportedly did business at 1550 Malaga Ave., Coral Gables, Florida, 33134.

19.     **ISABEL MEDINA** was the president of Merfi Corp. ("Merfi"), a corporation organized under the laws of the State of Florida, which purportedly did business at 4800 SW 8th Street, Coral Gables, Florida, 33134.

20.     **LERIDA LABRADA** was the vice president of Colima General Services, Corp. ("Colima General"), a corporation organized under the laws of the State of Florida, which purportedly did business at 9110 SW 31 Terrace, Miami, Florida, 33165.

21.     **LERIDA LABRADA** was the president of Dee Medical Center, Corp. ("Dee Medical"), a corporation organized under the laws of the State of Florida, which purportedly did business at 175 Fontainbleau Blvd, Suite 1G-8 Miami, Florida, 33172.

22.     **GERMAN MARTINEZ** was the owner and operator of David Printing and Design, Corp. ("David Printing"), a corporation organized under the laws of the State of Florida, which purportedly did business at 4111 NW 37 Ave., Lot D-426, Miami, Florida, 33142.

23.     **GERMAN MARTINEZ** was the owner and operator of Dream General Solutions, Corp. ("Dream General"), a corporation organized under the laws of the State of Florida, which purportedly did business at 939 NW 81 St., Lot #B204, Miami, Florida, 33150.

## COUNT 1
### Conspiracy to Commit Health Care Fraud
### (18 U.S.C. § 1349)

1.     Paragraphs 1 through 21 of the General Allegations section of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2.     From in or around October 2009, through in or around at least June 2012, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendants,

### ISABEL MEDINA
### and
### LERIDA LABRADA,

did knowingly and willfully combine, conspire, confederate and agree with Marina Sanchez Pajon, Miguel Jimenez, and others, known and unknown to the Grand Jury, to violate Title 18, United States Code, Section 1347, that is, to execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services.

### PURPOSE OF THE CONSPIRACY

3.     It was a purpose of the conspiracy for the defendants and their co-conspirators to unlawfully enrich themselves by, among other things: (a) providing prescriptions in return for the payment of bribes and kickbacks for medically unnecessary home health services; (b) offering and paying kickbacks and bribes to Medicare beneficiaries in exchange for the use of their Medicare beneficiary numbers as the bases of claims filed for home health care; (c) submitting and causing the submission of false and fraudulent claims to Medicare; (d) concealing of the

submission of false and fraudulent claims to Medicare, the receipt and transfer of the proceeds from the fraud, and the payment and receiving of kickbacks; and (e) causing the diversion of the proceeds of the fraud for the personal use and benefit of the defendants and their co-conspirators.

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the defendants and other co-conspirators sought to accomplish the object and purpose of the conspiracy included, among other things:

4.      **ISABEL MEDINA** and **LERIDA LABRADA** owned Merfi and Dee Medical, respectively, which were medical clinics where **MEDINA** and **LABRADA** were paid kickbacks and bribes by Marina Sanchez Pajon and Miguel Jimenez and their co-conspirators in exchange for providing fraudulent prescriptions for home health services that were medically unnecessary and not provided to Medicare beneficiaries.

5.      **ISABEL MEDINA, LERIDA LABRADA** and their co-conspirators caused patient documentation to be falsified to make it appear that Medicare beneficiaries qualified for and received home health services that were, in fact, not medically necessary and not provided.

6.      **ISABEL MEDINA, LERIDA LABRADA** and their co-conspirators filed and caused to be filed false and fraudulent claims with Medicare seeking payment for the costs of home health services that were not medically necessary and not provided.

7.      As a result of these false and fraudulent claims, Flores Home Health was paid more than $8 million by Medicare.

8.      **ISABEL MEDINA, LERIDA LABRADA** and other co-conspirators transferred and caused to be transferred the fraud proceeds to themselves and companies they controlled, and used the proceeds to further the fraud.

All in violation of Title 18, United States Code, Section 1349.

## COUNT 2

### Conspiracy to Defraud the United States and Receive Health Care Kickbacks
### (18 U.S.C. § 371)

1.      Paragraphs 1 through 23 of the General Allegations section of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2.      From in or around October 2009, and continuing through in or around at least June 2012, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendants,

**ISABEL MEDINA,**
**LERIDA LABRADA,**
**MAYRA FLORES,**
**and**
**GERMAN MARTINEZ,**

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate and agree with Marina Sanchez Pajon, Miguel Jimenez, and others known and unknown to the Grand Jury, to defraud the United States by impairing, impeding, obstructing, and defeating through deceitful and dishonest means, the lawful government functions of the United States Department of Health and Human Services in its administration and oversight of the Medicare program; and to commit certain offenses against the United States, that is to violate Title 42, United States Code, Section 1320a-7b(b)(1)(A), by knowingly and willfully soliciting and receiving remuneration, including any kickback and bribe, directly and indirectly, overtly and covertly, in cash and in kind, including by check, in return for referring an individual to a person for the furnishing and arranging for the furnishing of an item and service for which payment may be made in whole and in part by a Federal health care program, that is, Medicare.

## PURPOSE OF THE CONSPIRACY

3.      It was the purpose of the conspiracy for the defendants and their co-conspirators to unlawfully enrich themselves by: (1) soliciting and receiving kickbacks and bribes for referring Medicare beneficiaries to Flores Home Health so that their Medicare beneficiary numbers would serve as the bases of claims filed for home health care; and (2) submitting and causing the submission of claims to Medicare for home health services that the co-conspirators purported to provide to those beneficiaries.

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the defendants and their co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among others, the following:

4.      **ISABEL MEDINA, LERIDA LABRADA, MAYRA FLORES**, and **GERMAN MARTINEZ** solicited and received kickbacks from co-conspirators at Flores Home Health in exchange for referring Medicare beneficiaries to Flores Home Health for purported home health services.

5.      **ISABEL MEDINA, LERIDA LABRADA, MAYRA FLORES**, and **GERMAN MARTINEZ** caused Flores Home Health to submit claims to Medicare for home health services purportedly rendered to the Medicare beneficiaries.

6.      **ISABEL MEDINA, LERIDA LABRADA, MAYRA FLORES**, and **GERMAN MARTINEZ** caused Medicare to pay Flores Home Health based upon the claims for home health services purportedly rendered to Medicare beneficiaries.

## OVERT ACTS

In furtherance of the conspiracy, and to accomplish its objects and purpose, at least one co-conspirator committed and caused to be committed, in the Southern District of Florida, at least one of the following overt acts, among others:

1.      On or about May 6, 2010, **ISABEL MEDINA** deposited check number 0994, drawn on the corporate account of Billing Advance in the approximate amount of $6,300, into the corporate account of Yanis Telemarketing, a company she controlled.

2.      On or about July 8, 2010, **ISABEL MEDINA** deposited check number 1022, drawn on the corporate account of Billing Advance in the approximate amount of $8,850, into the corporate account of Yanis Telemarketing, a company she controlled.

3.      On or about August 24, 2010, **LERIDA LABRADA** deposited check number 1029, drawn on the corporate account of Billing Advance in the approximate amount of $5,300, into the corporate account of Colima General, a company she controlled.

4.      On or about September 9, 2010, **LERIDA LABRADA** deposited check number 1038, drawn on the corporate account of Billing Advance in the approximate amount of $6,400, into the corporate account of Colima General, a company she controlled.

5.      On or about September 20, 2010, **MAYRA FLORES** deposited check number 1743, drawn on Flores Home Health's corporate account in the approximate amount of $1,000, into an account held in her name.

6.      On or about May 12, 2011, **MAYRA FLORES** deposited check number 2366, drawn on Flores Home Health's corporate account in the approximate amount of $4,800, into an account held in her name.

7.      On or about May 6, 2010, **GERMAN MARTINEZ** deposited check number 1281, drawn on Flores Home Health's corporate account in the approximate amount of $1,200, into the corporate bank account of David Printing, a company he controlled.

8.      On or about June 18, 2010, **GERMAN MARTINEZ** deposited check number 1433, drawn on Flores Home Health's corporate account in the approximate amount of $4,300, into the corporate bank account of David Printing, a company he controlled.

All in violation of Title 18, United States Code, Section 371.

## COUNTS 3-10
### Receipt of Kickbacks in Connection with a Federal Health Care Program
### (42 U.S.C. § 1320a-7b(b)(1)(A))

1.      Paragraphs 1 through 23 of the General Allegations section of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2.      On or about the dates enumerated below, at Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendant, as specified below, did knowingly and willfully solicit and receive remuneration, that is, kickbacks and bribes, directly and indirectly, overtly and covertly, in the form of cash and checks, in return for referring an individual to a person for the furnishing and arranging for the furnishing of items and services for which payment may be made in whole and in part under a Federal health care program, that is, Medicare as set for below:

| Count | Defendant | Approximate Date | Approximate Amount of Kickback |
|-------|-----------|------------------|--------------------------------|
| 3 | ISABEL MEDINA | May 6, 2010 | $6,300 |
| 4 | ISABEL MEDINA | July 8, 2010 | $8,850 |

| Count | Defendant | Approximate Date | Approximate Amount of Kickback |
|---|---|---|---|
| 5 | LERIDA LABRADA | August 24, 2010 | $5,300 |
| 6 | LERIDA LABRADA | September 9, 2010 | $6,400 |
| 7 | MAYRA FLORES | September 20, 2010 | $1,000 |
| 8 | MAYRA FLORES | May 12, 2011 | $4,800 |
| 9 | GERMAN MARTINEZ | May 6, 2010 | $1,200 |
| 10 | GERMAN MARTINEZ | June 18, 2010 | $4,300 |

In violation of Title 42, United States Code, Section 1320a-7b(b)(1)(A) and Title 18, United States Code, Section 2.

## CRIMINAL FORFEITURE
### (18 U.S.C. § 982)

1.      The allegations contained in this Indictment are re-alleged and incorporated by reference as though fully set forth herein for the purpose of alleging forfeiture to the United States of America of certain property in which the defendants, **GERMAN MARTINEZ, LERIDA LABRADA, MAYRA FLORES,** and **ISABEL MEDINA** have an interest.

2.      Upon conviction of Counts 1 through 10 of this Indictment, the defendants, **ISABEL MEDINA, LERIDA LABRADA, MAYRA FLORES,** and **GERMAN MARTINEZ,** shall forfeit all of their right, title and interest to the United States in property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of such violations, pursuant to Title 18, United States Code, Section 982(a)(7).

3.     The property subject to forfeiture includes but is not limited to approximately $8,437,393 in United States currency, which sum represents the approximate gross proceeds of the charged offenses.

4.     If any of the property described above, as a result of any act or omission of the defendants:

> a. cannot be located upon the exercise of due diligence;
>
> b. has been transferred or sold to, or deposited with, a third party;
>
> c. has been placed beyond the jurisdiction of the court;
>
> d. has been substantially diminished in value; or
>
> e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(I).

A TRUE BILL

_____
FOREPERSON

_____
WIFREDO A. FERRER
UNITED STATES ATTORNEY

_____
BENJAMIN D. SINGER
DEPUTY CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

_____
A. BRENDAN STEWART
TRIAL ATTORNEY
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

UNITED STATES OF AMERICA

vs.

ISABEL MEDINA, et. al.,

Defendants.

_____/

CASE NO. _____

**CERTIFICATE OF TRIAL ATTORNEY*****

**Superseding Case Information:**

Court Division: (Select One)

| | | | |
|---|---|---|---|
| X | Miami | ___ | Key West |
| ___ | FTL | ___ | WPB     ___ FTP |

New Defendant(s)            Yes _____  No ____
Number of New Defendants
Total number of counts

I do hereby certify that:

1.   I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2.   I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3.   Interpreter:     (Yes or No)        Yes
     List language and/or dialect     Spanish _____

4.   This case will take     7     days for the parties to try.

5.   Please check appropriate category and type of offense listed below:

     (Check only one)                                  (Check only one)

| | | | | | |
|---|---|---|---|---|---|
| I | 0 to 5 days | _____ | Petty | | _____ |
| II | 6 to 10 days | __X__ | | Minor | _____ |
| III | 11 to 20 days | _____ | Misdem. | | _____ |
| IV | 21 to 60 days | _____ | Felony | | __X__ |
| V | 61 days and over | _____ | | | |

6.   Has this case been previously filed in this District Court? (Yes or No)      No
If yes:
Judge: _____        Case No. _____
(Attach copy of dispositive order)
Has a complaint been filed in this matter?      (Yes or No)     No
If yes:
Magistrate Case No.                        _____
Related Miscellaneous numbers:             _____
Defendant(s) in federal custody as of      _____
Defendant(s) in state custody as of        _____
Rule 20 from the     _____        District of _____

Is this a potential death penalty case? (Yes or No)      No

7.   Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to October 14, 2003?     _____ Yes     __X__ No

8.   Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to September 1, 2007?     _____ Yes     __X__ No

_____ For
A. BRENDAN STEWART
TRIAL ATTORNEY, U.S. DEPARTMENT OF JUSTICE
SD FL Court ID No.: A5501801

*Penalty Sheet(s) attached

REV 4/8/08

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name: ISABEL MEDINA**

**Case No:**

Count #: 1

Conspiracy to Commit Health Care Fraud

Title 18, United States Code, Section 1349

**\* Max.Penalty:**       Ten (10) years' imprisonment

Count #: 2

Conspiracy to Defraud the United States and Receive Health Care Kickbacks

Title 18, United States Code, Section 371

**\*Max. Penalty:**       Five (5) years' imprisonment

Counts #: 3 - 4

Receipt of Kickbacks in Connection with a Federal Health Care Program

Title 42, United States Code, Section 1320a-7b(b)(1)(A)

**\*Max. Penalty:**       Five (5) years' imprisonment as to each count

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name**: **LERIDA LABRADA**

Case No:

Count #: 1

 Conspiracy to Commit Health Care Fraud

 Title 18, United States Code, Section 1349

**\* Max.Penalty:**      Ten (10) years' imprisonment

Count #: 2

 Conspiracy to Defraud the United States and Receive Health Care Kickbacks

 Title 18, United States Code, Section 371

**\*Max. Penalty:**      Five (5) years' imprisonment

Counts #: 5-6

 Receipt of Kickbacks in Connection with a Federal Health Care Program

 Title 42, United States Code, Section 1320a-7b(b)(1)(A)

**\*Max. Penalty:**      Five (5) years' imprisonment as to each count

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name: MAYRA FLORES**

Case No:

Count #: 2

Conspiracy to Defraud the United States and Receive Health Care Kickbacks

Title 18, United States Code, Section 371

**\* Max.Penalty:**     Five (5) years' imprisonment

Counts #: 7-8

Receipt of Kickbacks in Connection with a Federal Health Care Program

Title 42, United States Code, Section 1320a-7b(b)(1)(A)

**\*Max. Penalty:**     Five (5) years' imprisonment as to each count

Count #:

**\*Max. Penalty:**

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

<u>PENALTY SHEET</u>

**<u>Defendant's Name</u>: GERMAN MARTINEZ**

**Case No:**

Count #: 2

  Conspiracy to Defraud the United States and Receive Health Care Kickbacks

  Title 18, United States Code, Section 371

**\* Max.Penalty:**     Five (5) years' imprisonment

Counts #: 9-10

  Receipt of Kickbacks in Connection with a Federal Health Care Program

  Title 42, United States Code, Section 1320a-7b(b)(1)(A)

**\*Max. Penalty:**     Five (5) years' imprisonment as to each count

Count #:

**\*Max. Penalty:**

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**